REED SMITH LLP
John P. Hooper
Eric F. Gladbach
Wallace B. Neel
599 Lexington Avenue
New York, New York  10022
(212) 521-5400

*Attorneys for Defendant*
*Fox Broadcasting Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
4KIDS ENTERTAINMENT, INC.,

                     Plaintiff,

- against -

FOX BROADCASTING COMPANY,

                   Defendant.
-----------------------------------------------------------x

No. 08-CV-4865 (GBD) (AJP)

**ANSWER AND**
**COUNTERCLAIM**

      Defendant Fox Broadcasting Company ("Fox"), by and through its attorneys Reed Smith

LLP, answers the Complaint (the "Complaint") of Plaintiff 4Kids Entertainment Inc. ("4Kids")

as follows:

      1.     Admits that the Complaint alleges causes of action for breach of contract and a

declaratory judgment, but denies knowledge or information sufficient to form a belief as to the

truth of the remaining allegations contained in Paragraph 1 of the Complaint and therefore denies

them, and respectfully refers the Court to the January 18, 2002 contract including any and all

applicable written and/or oral amendments (collectively, the "Contract") between Fox and 4Kids

for its complete and correct terms.

2.    Denies the nature of the allegations contained in Paragraph 2 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement and respectfully refers the Court to the Contract for its complete and correct terms.

3.    Denies the nature of the allegations contained in Paragraph 3 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement and respectfully refers the Court to the Contract for its complete and correct terms.

4.    Denies the nature of the allegations contained in Paragraph 4 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement and respectfully refers the Court to the Contract for its complete and correct terms.

5.    Denies the nature of the allegations contained in Paragraph 5 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement and affirmatively states that Fox has fully complied with the Contract.  Furthermore, Fox respectfully refers the Court to the Contract for its complete and correct terms.

6.    Denies the nature of the allegations contained in Paragraph 6 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement except admits that Fox has notified 4Kids that 4Kids is not entitled to any reduction of the fees it owed and owes to Fox under the Contract.  Furthermore, Fox respectfully refers the Court to the Contract for its complete and correct terms, and

7.    Denies the nature of the allegations contained in Paragraph 7 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement, and affirmatively alleges that 4Kids is in breach of the Contract as a result of its failure to pay $5 million due to Fox under that Contract.  Furthermore, Fox respectfully refers the Court to the Contract for its complete and correct terms.

8.      Denies the nature of the allegations contained in Paragraph 8 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement including its subparts, and respectfully refers the Court to the Contract for its complete and correct terms.

9.      Denies the nature of the allegations contained in Paragraph 9 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement and affirmatively states that Fox has fully complied with the Contract.  Furthermore, Fox respectfully refers the Court to the Contract for its complete and correct terms.

10.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 10 of the Complaint and therefore denies them.

11.     Admits the allegations of the first sentence of Paragraph 11 of the Complaint, but denies the allegations of the second sentence of Paragraph 11 of the Complaint.

12.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 of the Complaint, except admits that Fox is licensed to do business in New York State.

13.     Neither admits nor denies the allegations contained in Paragraph 13 of the Complaint because the CPLR are not applicable in federal court and the allegations constitute legal conclusions to which no response is required.

14.     Denies the allegations contained in Heading "A" of the Complaint and respectfully refers the Court to the Contract for its full and complete terms.

15.     Admits the allegations contained in Paragraph 14 of the Complaint and respectfully refers the Court to the Contract for its complete and correct terms.

16.     Admits the allegations contained in Paragraph 15 of the Complaint and respectfully refers the Court to the Contract for its complete and correct terms.

17.    Denies the nature of the allegations contained in Paragraph 16 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement and respectfully refers the Court to the Contract for its complete and correct terms.

18.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 of the Complaint therefore denies them, and respectfully refers the Court to the Contract for its complete and correct terms.

19.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 of the Complaint therefore denies them, and respectfully refers the Court to the Contract for its complete and correct terms.

20.    Denies the nature of the allegations contained in the first sentence of Paragraph 19 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement and affirmatively states that Fox has fully complied with the terms of the Contract. Fox denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the remainder of Paragraph 19 of the Complaint therefore denies them.  As to all allegations of Paragraph 19 of the Complaint, Fox respectfully refers the Court to the Contract for its complete and correct terms.

21.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of the Complaint therefore denies them, and respectfully refers the Court to the Contract for its complete and correct terms.

22.    Denies the nature of the allegations of the first sentence contained in Paragraph 21 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 21 of the Complaint therefore denies them.  As to

4

all allegations of Paragraph 21 of the Complaint, Fox respectfully refers the Court to the Contract for its complete and correct terms.

23.    Denies the nature of the allegations contained in Paragraph 22 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement and respectfully refers the Court to the Contract for its complete and correct terms.

24.    Denies the nature of the allegations contained in Paragraph 23 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement and respectfully refers the Court to the Contract for its complete and correct terms.

25.    Denies the allegations contained in Heading "B" of the Complaint.

26.    Denies the nature of the allegations contained in Paragraph 24 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement and affirmatively states that Fox has fully complied with the Contract.  Furthermore, Fox respectfully refers the Court to the Contract for its complete and correct terms.

27.    Denies the allegations contained in Paragraph 25 of the Complaint and affirmatively states that Fox has fully complied with the Contract.  Furthermore, Fox respectfully refers the Court to the Contract for its complete and correct terms.

28.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 of the Complaint, and affirmatively states that Fox has fully complied with the Contract.  Furthermore, as to all allegations of Paragraph 26 of the Complaint, Fox respectfully refers the Court to the Contract for its complete and correct terms.

29.    Denies the nature of the allegations contained in the first sentence of Paragraph 27 of the Complaint to the extent that they attempt to characterize the full terms of the parties' agreement.  Fox denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 27 of the Complaint therefore denies

them.  Fox denies the allegations contained in the third sentence of Paragraph 27 of the

Complaint.  Fox denies knowledge or information sufficient to form a belief as to the truth of the

allegations contained in the fourth and fifth sentences of Paragraph 27 of the Complaint

therefore denies them. As to each allegation of Paragraph 27 of the Complaint, Fox respectfully

refers the Court to the Contract for its complete and correct terms.

      30.    Denies the nature of the allegations contained in Paragraph 28 of the Complaint to

the extent that they attempt to characterize the full terms of the parties' agreement and

affirmatively states that Fox has fully complied with the Contract.  Furthermore, Fox respectfully

refers the Court to the Contract for its complete and correct terms.

      31.    Denies the nature of the allegations contained in Paragraph 29 of the Complaint to

the extent that they attempt to characterize the full terms of the parties' agreement, and

affirmatively alleges that 4Kids is in breach of the Contract as a result of its failure to pay $5

million due to Fox under that Contract.  Furthermore, Fox respectfully refers the Court to the

Contract for its complete and correct terms.

      32.    Denies the nature of the allegations contained in Paragraph 30 of the Complaint to

the extent that they attempt to characterize the full terms of the parties' agreement and

affirmatively states that Fox has fully complied with the Contract.  Furthermore, Fox respectfully

refers the Court to the Contract for its complete and correct terms.

      33.    Denies the nature of the allegations contained in Paragraph 31 of the Complaint to

the extent that they attempt to characterize the full terms of the parties' agreement and

affirmatively states that Fox has fully complied with the Contract.  Furthermore, Fox respectfully

refers the Court to the Contract for its complete and correct terms.

34.    No response is required to paragraph 32 of the Complaint.  To the extent a response is required, Fox incorporates its responses to Paragraphs 1-31 as if set forth herein in full.

35.    Admits the allegations of Paragraph 33 of the Complaint.

36.    Denies the allegations of Paragraph 34 of the Complaint.

37.    Denies the allegations contained in Paragraph 35 of the Complaint.

38.    Denies the allegations contained in Paragraph 36 of the Complaint to the extent that the allegations lack specificity as to the time and scope of the alleged notification.

39.    Admits that 4Kids has not paid a $5 million payment which was scheduled to be paid on or before April 1, 2008, and states that Fox has no knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 37 of the Complaint therefore denies them, and affirmatively alleges that 4Kids is in breach of the Contract as a result of its failure to pay $5 million due to Fox under that Contract. Furthermore, Fox respectfully refers the Court to the Contract for its complete and correct terms.

40.    Paragraph 38 of the Complaint contains conclusions of law to which no response is required.  To the extent that an answer is required, the allegations are denied.

41.    Denies the allegations contained in Paragraph 39 and all subparts of the Complaint, and affirmatively alleges that 4Kids is in breach of the Contract as a result of its failure to pay $5 million due to Fox under that Contract.  Furthermore, Fox respectfully refers the Court to the Contract for its complete and correct terms.

42.    No response is required to paragraph 40 of the Complaint.  To the extent a response is required, Fox incorporates its responses in Paragraphs 1-41 as if set forth herein in full.

43.     Denies the allegations contained in Paragraph 41 of the Complaint and respectfully refers the Court to the Contract for its complete and correct terms.

44.     To the extent that a response is required to the "Wherefore" paragraph and subparagraphs, Fox denies all allegations therein.

45.     To the extent that any allegation of the Complaint other than those identified above requires a response, Fox denies all such allegations.

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

46.     The Complaint fails to set forth facts sufficient to state a claim upon which relief may be granted against Fox and further fails to state facts sufficient to entitle 4Kids to the relief sought, or to any other relief whatsoever from Fox.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

47.     4Kids is estopped and barred from the recovery of any damages which 4Kids may have sustained, which Fox continues to deny.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

48.     4Kids has waived any and all claims for relief.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

49.     4Kids' claims are barred in whole or in part by its failure to mitigate its damages.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

50.     4Kids' claims are barred in whole or part by its ratification of Fox's conduct pursuant to the terms of the Contract.  Therefore, 4Kids is barred from the recovery of any damages.

### AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

51.     4Kids' claims are barred in whole or part by the applicable statutes of limitation or repose, and/or by the doctrine of laches.

### AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

52.    4Kids' claims are barred in whole or part because Fox performed in accordance with the Contract and Fox at all times acted in good faith.

### AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

53.    4Kids' claims are barred in whole or part by the doctrine of accord and satisfaction.

### AS AND FOR A NINTH AFFIRMATIVE DEFENSE

54.    4Kids' claims are barred in whole or part because Fox did not intend to harm 4Kids.

### AS AND FOR A TENTH AFFIRMATIVE DEFENSE

55.    4Kids' is barred from the recovery of any damages which 4Kids may have sustained, which Fox continues to deny, by the doctrine of offset.

### AS AND FOR A ELEVENTH AFFIRMATIVE DEFENSE

56.    4Kids' claims are barred in whole or part because 4Kids is in breach of the Contract.

### AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

57.    4Kids' claims are barred in whole or part because 4Kids has prevented and/or has stated its intention to prevent Fox from performing under the Contract.

### AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

58.    Fox reserves the right to assert additional affirmative defenses, at such time, and to such extent as warranted by discovery and factual developments in this case.

## COUNTERCLAIMS

1.      For its Counterclaims against 4Kids, Fox alleges as follows:

**Summary of Counterclaims**

2.      For the last six "Broadcast Seasons," from September 14, 2002 until September 9, 2008, 4Kids and Fox have been engaged in a business relationship in which Fox has broadcast 4Kids' programming through its nationwide "Network" of television stations. The initial written contract was signed on or about January 18, 2002, and provided that 4Kids would purchase from Fox the right to broadcast children's programming in each of four one-year "Broadcast Seasons" between September 14, 2002 and September 9, 2006. A true and correct copy of the January 28, 2002 contract is annexed hereto as Exhibit A.

3.      The basic terms of the Contract were that 4Kids would pay Fox in excess of $25 million per Broadcast Season for four years, and that Fox would broadcast 4Kids' programming into at least 90% of the television households in the United States. If Fox's broadcast "clearance" rate fell below 90% in any single Broadcast Season, 4Kids would be entitled to a refund pursuant to the terms of the Contract.

4.      During the first four Broadcast Seasons of the contract, from September 12, 2002 to approximately September 12, 2006, 4Kids never claimed that Fox had fallen short of the 90% threshold. Indeed, 4Kids was so satisfied with Fox's performance that, as the expiration of the initial four-year contract neared, 4Kids negotiated and executed a two-year extension of the contract, as reflected in an agreement which the parties signed on or about March 2, 2006. At no point during the negotiation and execution of that extension did 4Kids ever claim that the Fox's clearance rate in the preceding four Broadcast Seasons was below 90%, nor did 4Kids make any attempt to refine the Contract's "clearance" calculation, nor did 4Kids ever seek a "refund" based upon Fox's purported clearance rate of less than 90%.

10

5.    In or around October 2007, 4Kids announced a deal with the CW television network ("CW") under which CW would serve as the programming outlet for 4Kids' programming.  Upon information and belief, after executing the contract with CW, 4Kids no longer wanted to continue its contractual relationship with Fox because it was less commercially attractive to 4Kids than the agreement with CW.  Upon information and belief, 4Kids therefore sought a reason to avoid its remaining payment obligations under the Contract with Fox.

6.    Within three months of announcing an agreement with CW, 4Kids suddenly declared that Fox had actually been in "breach" of the Contract during each and every one of the preceding Broadcast Seasons due to Fox's alleged failure to reach the 90% threshold in each of those Broadcast Seasons.

7.    4Kids failed to pay a $5 million installment of the fee that was due on April 1, 2008, and claimed that it was entitled to keep that money to "offset" the refund that it was now claiming a right to as a result of its belated—and false—claim that Fox had not reached at least 90% of U.S. television households during the preceding five-plus Broadcast Seasons.

8.    Furthermore, 4Kids informed Fox that it intended to refuse to pay another $5 million installment due to Fox in July 2008 as a further "offset."

9.    Fox has, in fact, broadcasted 4Kids' programming to at least 90% of U.S. television households in each and every Broadcast Season of the relationship in full compliance with the terms of the Contract.  Indeed, given 4Kids' failure to ever allege any "failure" by Fox on this point during a five-year course of dealing in which 4Kids paid Fox over $100 million, it strains credulity for 4Kids to assert otherwise.

10.    4Kids' belated attempt to manufacture a "breach" that extends back to the inception of the Contract is a transparent attempt to avoid paying the remaining $10 million it owes to Fox for the current Broadcast Season.  It is 4Kids, not Fox, that has breached the

Contract, through its unjustified refusal to pay $10 million in remaining fees owed to Fox for the 2007-2008 Broadcast Season.

**Jurisdiction Is Proper Before This Court**

11.     Upon information and belief, 4Kids is a corporation organized under the laws of the State of New York with its principal place of business in New York County.

12.     Fox is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of California.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this action involves citizens of different states and the amount-in-controversy is in excess of $75,000.

14.     This Court has personal jurisdiction over the parties because 4Kids conducts business operations from their offices in New York County and Fox conducts business in New York County.

15.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(a).

**The Initial Four-Year Contract**

16.     Under the initial four-year term of the contract, 4Kids agreed to provide Fox with sufficient children's programming to fill a four-hour "Block" of time, which was defined as "the Saturday morning time period commencing at 8:00 am and ending at 11:59:50 am in the Eastern and Pacific time zones and commencing at 7:00 am and ending at 10:59:50 am in the Mountain and Central time zones throughout the Programming Term."  Exhibit A, at 1.

17.     Under the initial four-year contract, 4Kids further agreed to pay Fox in excess of $25 million per Broadcast Season as a "Time Buy Fee," as specified in the Contract.

18.     Fox, in turn, agreed that if its "average Network clearance for the Block for a Broadcast Season  . . . is below 90% of the television households in the U.S. ('U.S. Households')

due to causes other than force majure on a Station-by-Station basis, but not on a Network-wide basis, pre-emptions for Sports Programming, or [4Kids]'s failure to deliver Programs," then 4Kids would be entitled to a refund of a pro rata portion of the Time Buy Fee for that Broadcast Season based upon a formula set forth in the Contract. Exhibit A at 3.

19.    The Contract provided that Fox would use "commercially reasonable efforts" to convince its affiliate stations to broadcast 4Kids' programming. Exhibit A at 4.

20.    The Contract further provided that "[i]n accordance with FOX's customary practice, FOX will have the right to permit the Stations and FOX Net to shift the broadcast times of the Block (including without limitation to accommodate pre-emptions and make goods)." Exhibit A at 13.

21.    At the outset of the Contract, 4Kids was informed that several stations would exhibit 4Kids' programming "out of pattern." 4Kids did not object to this broadcasting arrangement, nor did it claim or suggest that any "out of pattern" broadcasting would not count toward Fox's clearance requirements under the Contract.

22.    On those occasions that Fox was required to preempt 4Kids' programming, Fox's practice was to negotiate a "make good" broadcast with 4Kids, which meant that the regularly-scheduled 4Kids programming would be exhibited at a different time. Fox communicated those "make goods" to 4Kids on a weekly basis throughout the contract term, and routinely worked with 4Kids and the preempting station(s) to ensure that 4Kids was satisfied with the proposed make good broadcast time. 4Kids was actively involved in that process of negotiating and selecting the optimal available make good times, and never took the position that make good broadcasts did not count toward Fox's 90% clearance rate.

23.    Moreover, within six weeks of the effective date of the contract, 4Kids agreed that it would be acceptable if Fox broadcasted 4Kids' programming in the Pacific time zone one hour

earlier (i.e., between 7 a.m. and 11 a.m. Pacific Time) because, among other reasons, the time difference between the east and west coasts would result in an inordinate number of pre-emptions for sporting events.  Thus, during nearly the entire first four years of the contract, Fox has broadcast 4Kids' programming between 7 a.m. and 11 a.m. in portions of the Pacific time zone, and 4Kids has never (until now) declared that Fox's clearance rate was below 90%.

**The Two-Year Extension of the Contract**

24.     On or about March 2, 2006, 4Kids and Fox executed an amendment (the "March 2006 Amendment") in which they agreed to extend the term of the Contract by two Broadcast Seasons, until September 2, 2008 at a rate of $20 million per Broadcast Season.  A true and correct copy of the March 2006 Amendment is annexed hereto as Exhibit B.

25.     Notably, despite the fact that 4Kids was aware of (i) Fox's practices concerning the use of "make good" broadcasts, and (ii) the exhibition of 4Kids' programming in portions of the Pacific time zone one hour earlier than the period stated in the Contract's definition of the "Block," 4Kids failed to raise any complaint during the negotiation and execution of the March 2006 Amendment that Fox's "clearance" rate for 4Kids' programming during the first four Broadcast Seasons had fallen short of the 90% threshold.

26.     The 2006 Amendment permitted 4Kids to pay the Time Buy Fee in installments and set forth an agreed-upon payment schedule, *viz*.:

> [4Kids] hereby agrees to extend the Programming Term until September 8, 2008.
> In consideration of the extension of the Programming Term, Company shall pay
> FOX a "Time Buy Fee" of $20 million in cash for the 2006-2007 Broadcast
> Season. The "Time Buy Fee" shall be payable in accordance with the following
> payment schedule:

| DUE DATE | PAYMENT |
|---|---|
| October 1, 2006 | $5,000,000 |
| January 1, 2007 | $5,000,000 |
| April 1, 2007 | $5,000,000 |
| July 1, 2007 | $5,000,000 |

14

| | |
|---|---|
| October 1, 2007 | $5,000,000 |
| January 1, 2008 | $5,000,000 |
| **April 1, 2008** | **$5,000,000** |
| **July 1, 2008** | **$5,000,000** |

Exhibit B, March 2006 Amendment, at 1 (emphasis added).

## 4Kids Belatedly Declares that Fox Has Been in "Breach" For Nearly Six Years

27.     In early October 2007, 4Kids announced that it had signed a contract with CW under which CW would broadcast 4Kids programming.

28.     Upon information and belief, with the CW agreement in place, the Contract with Fox became commercially less attractive to 4Kids, and 4Kids decided to attempt to avoid paying the remaining amounts it owes to Fox under the Contract.

29.     In nearly six years of performance under the Contract, Fox has always provided 4Kids with data concerning the clearance rate, and 4Kids has never claimed that Fox's clearance rate was below 90%.

30.     However, 4Kids has now claimed that Fox has never provided 4Kids with a 90% clearance rate.  Thus, 4Kids alleges that despite the facts that (i) 4Kids performed under the Contract for nearly 6 years without ever claiming a breach; (ii) 4Kids paid Fox well over $100 million in Time Buy Fees during that period; and (iii) Fox permitted 4Kids to renew the agreement in March 2006 based in large part upon Fox's reliance on the good faith course of dealing between the parties, 4Kids has now suddenly realized that Fox has been in breach all along, and that 4Kids is therefore entitled to $11.2 million as a pro rata refund based upon "breaches" dating back to 2002.

31.     Furthermore, 4Kids failed to pay Fox a $5 million installment of the Time Buy Fee for the current Broadcast Season which was due on April 1, 2008.  4Kids claimed that it was entitled to "offset" that amount against the belatedly-declared "refund" it is allegedly owed.

32.    4Kids also communicated to Fox in writing that it intends to withhold payment of a scheduled $5 million payment on July 1, 2008, again, as a "refund."

33.    4Kids' belated declaration that Fox did not meet the 90% clearance rate is spurious and false, as is obvious from the surrounding circumstances.  4Kids' calculation is wrong both under the plain text of the Contract and under the parties' course of dealing.

### AS AND FOR A FIRST COUNTERCLAIM AGAINST 4KIDS
#### (Breach of Contract)

34.    Fox reasserts and realleges each and every paragraph of the Counterclaims as though fully set forth herein.

35.    The Contract existed between Fox and 4Kids.

36.    The Contract was supported by consideration.

37.    Fox performed its obligations under the Contract.

38.    4Kids breached the Contract by failing to comply with or perform the applicable terms, covenants, obligations and conditions

39.    4Kids breached the Contract by failing to pay a $5,000,000 (FIVE MILLION DOLLAR) payment which became due and owing on April 1, 2008.

40.    As a direct result of 4Kids's breach of the Contract, Fox has been damaged in an amount to be determined at trial, but in excess of $5,000,000 (FIVE MILLION DOLLARS).

### AS AND FOR A SECOND COUNTERCLAIM AGAINST 4KIDS
#### (Anticipatory Breach of Contract)

41.    Fox reasserts and realleges each and every paragraph of the Counterclaims as though fully set forth herein.

42.    4Kids has definitely and finally communicated to Fox in writing its intention to forgo performance of the remainder of its contractual obligations under the Contract.

43.    4Kids has definitely and finally communicated to Fox in writing its intention to refuse to pay a $5,000,000 (FIVE MILLION DOLLAR) payment which is scheduled to become due and owing on July 1, 2008.

44.    Fox was ready, willing, and able to perform its obligations under the Contract at all times.

45.    Fox has continued to perform its obligations under the Contract since April 1, 2008, despite 4Kids' failure to pay the $5,000,000 (FIVE MILLION DOLLAR) payment which became due and owing on April 1, 2008.

46.    As a direct result of 4Kids's anticipatory breach of the Contract, Fox has been damaged in an amount to be determined at trial, but in excess of $5,000,000 (FIVE MILLION DOLLARS).

### AS AND FOR A THIRD COUNTERCLAIM AGAINST 4KIDS
### (Quantum Meruit)

47.    Fox reasserts and realleges each and every paragraph of the Counterclaims as though fully set forth herein.

48.    Fox supplied 4Kids with broadcasting time that has aided and enriched 4Kids.

49.    4Kids has obtained the benefit of Fox broadcasting time and has failed and/or refused to pay for said broadcasting time.

50.    By virtue of the foregoing, 4Kids is liable in *quantum meruit* for the amount of the reasonable value of the broadcasting time.

### AS AND FOR A FOURTH COUNTERCLAIM AGAINST 4KIDS
### (Unjust Enrichment)

51.    Fox reasserts and realleges each and every paragraph of the Counterclaims as though fully set forth herein.

52.    4Kids has derived and continues to derive substantial revenue and benefit from its use of Fox's airtime under the Contract.

53.    It would be against equity and good conscience to allow 4Kids to retain the substantial revenues and profits it has realized through its use of Fox's airtime for which it has refused and failed to pay.

54.    4Kids has been unjustly enriched by its use of said airtime in violation of its obligations under the Contract.

55.    Fox lacks an adequate remedy at law.

### AS AND FOR A FIFTH COUNTERCLAIM AGAINST 4KIDS
#### (Declaratory Judgment)

56.    Fox reasserts and realleges each and every paragraph of the Counterclaims as though fully set forth herein.

57.    Fox is entitled to a declaration that 4Kids's failure and refusal to pay the $5 million due and owing to Fox on April 1, 2008 constitutes a breach of its obligations under the Contract.

58.    Fox is entitled to a declaration that 4Kids's statement that it does not intend to pay the $5 million due and owing to Fox on July 1, 2008 constitutes an anticipatory breach of its obligations under the Contract.

**WHEREFORE,** defendant demands judgment as follows:

A.    Dismissing 4Kids's Complaint against Fox with prejudice and entering final judgment against 4Kids;

B.    Denying 4Kids's request for a money judgment, accounting, interest, costs, attorneys' fees, and any other relief against Fox;

C.    Declaring that 4Kids has breached the Contract and has anticipatorily breached the Contract;

D.    Awarding Fox all costs, expenses, and attorneys' fees incurred in defending against 4Kids's claims;

E.    Awarding Fox all damages to which it is entitled under the Counterclaims, plus interest (including pre-judgment interest), all costs, expenses and attorneys' fees incurred in pursuing the Counterclaims; and

F.    Awarding Fox such other and further relief as the Court deems just, proper, and equitable.

Dated:  New York, New York
        June 3, 2008

REED SMITH LLP

By: _____

John P. Hooper
Eric F. Gladbach
Wallace B. Neel
599 Lexington Avenue
New York, New York  10022
(212) 521-5400
*Attorneys for Defendant*
*Fox Broadcasting Company*

TO:    KAYE SCHOLER LLP
       425 Park Avenue
       New York, NY  10022
       (212) 836-8000

       *Attorneys for Plaintiff*
       *4Kids Entertainment, Inc.*

19

**EXHIBIT A**

# FOX BROADCASTING COMPANY AND 4KIDS ENTERTAINMENT, INC.
## SATURDAY MORNING PROGRAMMING BLOCK TIME LICENSE
## MINIMUM TERMS

When signed by the parties below, this term sheet ("Term Sheet") shall confirm the material terms of the agreement between 4Kids Entertainment, Inc. and Fox Broadcasting Company for the Saturday Morning Programming Block.

For the purpose of these terms:

"Block" means the Saturday morning time period commencing at 8:00 am and ending at 11:59:50 am in the Eastern and Pacific time zones and commencing at 7:00 am and ending at 10:59:50 am in the Mountain and Central time zones throughout the Programming Term.

"Children's Program" means a television program that is originally produced and broadcast for an audience of children 12 years old and under.

"FOX" means FOX Broadcasting Company.

"Network" means the national television service operated by FOX.

"Program" means a one-half hour or hour television program that 4Kids Entertainment, Inc., ("Company") supplies, and FOX approves, as permitted herein, for exhibition on the Network inside the Block during the Programming Term (defined below).

1.  Programming Term

Subject to the terms hereof, Company will have the exclusive right to program the Block for four one-year broadcast seasons (each a "Broadcast Season" and collectively the "Programming Term"), commencing on September 14, 2002 of the 2002-2003 Broadcast Season and ending on September 9, 2006 of the 2005-2006 Broadcast Season. Throughout the Programming Term Company shall provide sufficient Programs (meeting all delivery and all other requirements herein) to fill the Block.

2.    Programming Term Extension

a.     FOX grants to Company an option to extend the Programming Term
for one Broadcast Season (*i.e.*, the 2006-2007 Broadcast Season).  If
Company elects to exercise such option, Company shall deliver written
notice of such exercise to FOX on or before December 15, 2005.

b.     If Company exercises the option set forth in Paragraph 2.a., Company
shall have an option to extend the Programming Term for one Broadcast
Season (*i.e.*, the 2007-2008 Broadcast Season); provided, however, that
Company acknowledges that as of the date of this Term Sheet, the 2007-
2008 Broadcast Season ends on June 30, 2008, and FOX may or may not
extend its agreements with the Stations to make the Broadcast Season a full
twelve months.  If Company elects to exercise such option, Company shall
deliver written notice of such exercise to FOX on or before December 15,
2006.

c.     If Company exercises both the options set forth in subparagraphs a.
and b. above, and FOX elects in its sole discretion to lease the Block for the
2008-2009 Broadcast Season, FOX will so notify Buyer no later than
November 1, 2007.  Commencing November 15, 2007 and ending on
December 15, 2007 ("Negotiation Term"), Company will have the exclusive
right to negotiate with FOX the terms and conditions under which the
Programming Term may be extended.  If Buyer and FOX do not reach
agreement on or prior to December 15, 2007, then, until March 30, 2008,
FOX shall not enter into an agreement with a third party for the rights
offered to Company on terms that are more favorable to such third party than
the terms of the last offer made by FOX to Company during the Negotiation
Term without first offering such terms to Company.  Such negotiation rights
and first refusal rights shall be in accordance with FOX's standard terms.

d.     If Company exercises either or both of the options set forth in this
Paragraph 2., the additional Broadcast Seasons shall be sometimes called the
"Programming Extension Term," in this Term Sheet.

3.    Broadcast Coverage

a.    Reduction in Fee for Loss of National Coverage.  If the average Network clearance for the Block for a Broadcast Season during the Programming Term (and the Programming Extension Term, if applicable) is below 90% of the television households in the U.S. ("U.S. Households") due to causes other than events of force majeure on a Station-by-Station basis but not on a Network-wide basis, pre-emptions for the Sports Programming set forth in paragraph 3.d. below, or Company's failure to deliver Programs, as set forth in this Term Sheet, then the Time Buy Fee for that Broadcast Season shall be an amount equal to the Time Buy Fee for that Broadcast Season, multiplied by a fraction, the numerator of which shall be the actual average percentage of Network clearance achieved and the denominator of which shall be 90 (*e.g.*, if during the 2002-2003 Broadcast Season, Programs are made available to an average of 88% of U.S. Households, then the 2002-2003 Time Buy Fee shall be an amount equal to the 2002-2003 Time Buy Fee multiplied by 88/90).

b.    Reduction in Fee for Network Clearance below 80%.  If the average Network clearance for the Block for a Broadcast Season during the Programming Term (and Extension Term, if applicable) is below 80% of "U.S. Households" due to causes other than events of force majeure on a Station-by-Station basis but not on a Network-wide basis, pre-emptions for the Sports Programming set forth in Paragraph 3.d. below, or Company's failure to deliver programs, as set forth in this Term Sheet, then, in lieu of the reduction set forth in subparagraph a. immediately above, the Time Buy Fee for such Broadcast Season shall be reduced as follows:

(i)    The Time Buy Fee shall be reduced by 11.1% for the first 10% of the reduction in average Network Clearance (i.e., from 90% coverage to 80% coverage); and

(ii)    The Time Buy Fee shall also be reduced by an amount equal to the original Time Buy Fee for that Broadcast Season, multiplied by a fraction, the numerator of which shall be ([80 minus the actual average percentage of Network clearance achieved] multiplied by 2) and the denominator of which shall be 90.

For example, if average Network clearance is 70% for a Broadcast Season, and is not due to any of the listed exclusions, the Time Buy Fee shall be reduced by the sum of 11.1% pursuant to subparagraph (i) above and 22.2% [((80 minus 70) multiplied by 2) divided by 90] pursuant to subparagraph (ii) above, for a total reduction of the Time Buy Fee of 33.3%.

c.      The amount by which any Time Buy Fee is reduced pursuant to this Paragraph 3. shall be deducted from Company's remaining payments due pursuant to Paragraph 5. below, or if such deduction from the remaining payments is insufficient to fully compensate Company for the amount of such reduction, then FOX shall promptly refund in cash to Company the amount that Company was unable to deduct from the remaining payments.

d.      Company acknowledges that in each Broadcast Season FOX may pre-empt the Block or part of the Block for "Sports Programming" without affecting the calculation of Network clearance as follows: up to three Saturdays for FOX telecasts of NFL games, plus up to one Saturday for FOX telecasts of the World Bowl game.  The number of protected pre-emptions set forth in this subparagraph shall be determined by FOX, in its sole discretion, within the limits set forth herein.

e.      FOX will use commercially reasonable efforts to cause the Stations to exhibit the Block.  Notwithstanding anything to the contrary in this Term Sheet, FOX reserves the right to pre-empt the Block, or part of the Block, including without limitation for events of national importance.

f.      If in two consecutive calendar quarters in a Broadcast Season the average Network clearance for the Block during each quarter is (due to causes other than force majeure on a Station-by-Station basis but not on a Network-wide basis, pre-emptions for the Sports Programming set forth in Paragraph 3.d., or Company's failure to deliver Programs as set forth in this Term Sheet) either below 75% of U.S. Households or below 80% of U.S. Household and the Network does not have a Station in one of the ten major television markets other than Atlanta, Georgia (*i.e.*, New York City, Los Angeles, Chicago, Philadelphia, San Francisco, Boston, Dallas, District of Columbia and Detroit) (collectively the "Limits"), Company shall have the option to terminate the agreement between FOX and Company for the Block

as follows.

Within ten (10) business days following the end of any calendar quarter in which the Network clearance is below the Limits, FOX will notify Company thereof. Additionally, FOX shall notify Company of the average Network clearance for U.S. Households for the next consecutive calendar quarter, and if the average Network clearance of U.S. Households is still below the Limits in that consecutive calendar quarter, Company may, at its option, terminate the agreement. If Company desires to terminate the agreement, Company shall provide Network with written notice of termination within thirty (30) days from Company's receipt of Network's notice that the Network clearance for the second of two consecutive calendar quarters was below the Limits. Such termination shall be effective on the date specified by Company in the written notice; provided, however, that such termination shall not be effective earlier than the date that is six (6) months following FOX's receipt of Company's written termination notice unless FOX notifies Company, in writing, that FOX elects a termination date before the end of such six-month period. (For example, FOX were to elect to terminate at the end of the Broadcast Season even though it is less then six months after the date of FOX's receipt of the written termination notice.)

If Company exercises its option to terminate and the agreement terminates as provided in this Paragraph 3.f., Company shall be responsible for the pro-rata proportion of the Time Buy Fee based on the length of time between the beginning of the Broadcast Season in which the termination occurs and the termination date (subject to any adjustment on the same pro-rata basis as provided in subparagraphs a. and b. of this Paragraph 3). If Company's written termination notice is received by FOX in one Broadcast Season but the termination does not occur until after the start of the next Broadcast Season, and if the pro-rata Time Buy Fee for such next Broadcast Season, with any adjustment as set forth in subparagraphs a. and b. above, is insufficient to compensate for Company's losses in advertising revenues as a result of lower CPMs due to Network's clearance being below the Limits in such next Broadcast Season, FOX and Company shall negotiate in good faith a further adjustment to the pro-rata Time Buy Fee to reflect the lower CPMs. For example, if FOX received Company's written termination notice on July 2, 2004, and the termination date were January 1, 2005, and Company's losses in advertising revenues as a result of such lower CPMs

for the 2004-2005 Broadcast Season were not covered by the adjustments to the Time Buy Fee in subparagraphs a. and b. above, the parties would negotiate a further adjustment in good faith for the 2004-2005 Time Buy Fee.

4.    <u>Inventory Split and Retention of Customary Time for FOX and FOX Stations</u>

   a.    <u>National and Local Units</u>.  For each Broadcast Season, Company shall have the exclusive right to sell, within the parameters set forth in this Term Sheet, all national advertising units in the Block and to retain the revenue therefrom.  FOX shall retain all local advertising units in the Block for such use as FOX elects in its sole discretion.  The advertising units in the Block are allocated as follows:

| | |
|---|---|
| Advertising Time in Children's Programs (*i.e.*, 10.5 minutes per hour in total) | 64 national :30 units<br>20 local :30 units |
| Advertising Time in All Other Programs (*i.e.*, 14 minutes per hour in total) | 56 national :30 units<br>56 local :30 units |

Company shall bear all responsibility for executing, and all costs incurred in connection with, the sale and use of all national units and for the collection of payments from advertisers.  If any state, federal (including without limitation FCC) or other governmental law, regulation or rule or any other action reduces or otherwise limits the commercial advertising (or other non-program time) that can be used in any or all Children's Programs, then FOX will, notwithstanding anything to the contrary in this Term Sheet or otherwise, be entitled to likewise reduce the national advertising units available to Company in the Block; and to the extent FOX requires such reduction, the Time Buy Fee shall be reduced pro-rata for each Broadcast Season affected thereby.  Company shall indemnify, defend and hold harmless each and every Station from and against any and all claims that the Station has violated the CTA (as defined in subparagraph 8(b) below) to the extent such claim is based on Company exceeding the amount of national

commercial time permitted by FOX in this Term Sheet (as FOX may reduce such amount pursuant to this paragraph).

b. <u>Promotional Announcements</u>. Company will have the right to use, for promotional purposes as Company elects, all the time in the Block that is allocated for national promotional use (as set forth in FOX's delivery requirements or formats, or that is otherwise designated by FOX as available for national promotional use); provided, however, that Company may use such time to promote only viewership of the Programs in the Block on the Network or for public service announcements.

c. <u>Station Identification and Other Customary Network and Station Time</u>. Notwithstanding anything to the contrary in this Term Sheet, FOX shall retain within the Block all time as is needed customarily for the purpose of Network identification and compliance with applicable laws, rules and regulations, including without limitation, station identifications.

5. <u>Time Buy Fee and Payment Schedule</u>

a. As consideration for all rights granted to Company hereunder, Company shall pay to FOX a "Time Buy Fee," which shall be a combination of cash and common stock of Company ("Shares") totaling $25,312,500 for each of the 2002-2003 Broadcast Season, the 2003-2004 Broadcast Season, the 2004-2005 Broadcast Season and the 2005-2006 Broadcast Season with the amount of cash and Shares being determined in Company's discretion subject to the following: the total value of Shares issued to FOX for the portion of the Time Buy Fee due FOX for any Broadcast Season shall not exceed $10,312,500 (in other words, FOX will receive at least $15 million in cash). The price of the Shares to be issued to FOX during any calendar quarter would be the average price of Company's stock on the New York Stock Exchange on the twenty (20) trading days immediately preceding the date of issuance of the Shares ("Price").

The Time Buy Fee shall be paid on the basis of the payment schedule set forth in Paragraph 5.b. below.

The Shares issued to FOX shall be subject to the following:

(i)    Voting Rights – FOX shall sign a voting trust agreement providing that all voting rights to the Shares shall be vested in Company until the Shares are sold to the public.

(ii)    Registration – The Shares shall be registered for resale so that the Shares issued to FOX can be immediately sold by FOX as of the date such payment in Shares is made to FOX.

(iii)    If during any three-month period from the date of issue of Shares to FOX, FOX sells any or all of the Shares issued to FOX during such three-month period at a price per share that is less than the Price at which such Shares were issued to FOX Company shall pay FOX an amount equal to the difference between the proceeds FOX would have received had the Shares been sold at the Price at which the Shares were issued and the amount that FOX actually received from the sale of such Shares (the "Shortfall"). Company shall pay to FOX such Shortfall in cash or Shares, at Company's option; provided, however that the Share price for any part of the Shortfall that is paid in Shares would be the average price of Company's stock on the New York Stock Exchange on twenty (20) trading days immediately preceding the date of issuance of the Shares to pay the Shortfall. The net result of the foregoing is that Company guarantees that FOX shall receive not less than an amount equal to the Shares multiplied by the Price as of the date of issuance on any Shares sold by FOX during the three-month period after the issuance of such Shares to FOX. If the Shares issued to FOX increase in value during the period between the date of issuance and the date of FOX's sale of such Shares, FOX shall keep such increase in value. If FOX elects to hold some or all of the Shares issued during any three-month period after the end of the three-month period in which such Shares were issued, FOX shall bear the market risk of owning such Shares after the end of the three-month period in which issued, and Company shall not be liable for any shortfall occurring on sales of such Shares after the end of the three-month period.

The Time Buy Fee shall be subject to adjustment as provided in this Term Sheet.

b.    Company shall pay the Time Buy Fee as follows:

(i)    for the 2002-2003 Broadcast Season: 50% within ten (10) calendar days following the date of the execution of this Term Sheet by the parties with the balance paid in four equal installments of 12.5% on or before September 1, 2002, December 1, 2002, February 1, 2003 and April 1, 2003;

(ii)    for the 2003-2004 Broadcast Season: 50% on or before June 1, 2003, with the balance paid in four equal installments of 12.5% on or before September 1, 2003, December 1, 2003, February 1, 2004; and April 1, 2004;

(iii)    for the 2004- 2005 Broadcast Season: 50% on or before June 1, 2004, with the balance paid in four equal installments of 12.5% on or before September 1, 2004, December 1, 2004, February 1, 2005; and April 1, 2005; and

(iv)    for the 2005-2006 Broadcast Season: 50% on or before June 1, 2005, with the balance paid in four equal installments of 12.5% on or before September 1, 2005, December 1, 2005, February 1, 2006; and April 1, 2006.

For the 2002-2003 Broadcast Season the 50% payment (*i.e.*, the first payment) due shall be in cash with the remaining payments to be made in a combination of cash and Shares, at Company's election. Beginning with the 2003-2004 Broadcast Season and continuing through all remaining Broadcast Seasons, the 50% payment (*i.e.*, the one due on June 1 of each calendar year) may be paid in cash and Shares, but no less than $7,500,000 of such payment shall be in cash.

c.    The Time Buy Fee for the 2006-2007 Broadcast Season shall be $26,578,125, and for the 2007-2008 Broadcast Season shall be $27,907,031; provided, however, that if the 2007-2008 Broadcast Season ends on June 30, 2008, such Time Buy Fee shall be $22,003,621. The payment schedule of

the Time Buy Fee for the Broadcast Seasons during the Programming Extension Term shall be at the same intervals as the payment schedule for the 2005-2006 Broadcast Season with the maximum portion of the Time Buy Fee paid to FOX in Shares for any Broadcast Season in the Programming Extension Term shall not to exceed the amount of the Time Buy Fee less $15 million.

6.    Promotion of the Block on the Network

    a.    FOX will allocate to Company fifty-two (52) 30-second promotional spots per calendar year on the Network to promote the Programs. Such promotional time will be outside of the Block, at times to be selected by FOX in its sole discretion after taking into account the audience profile desired by Company, but within the exigencies of Network scheduling. If Company elects, FOX shall exhibit half the promotional spots (*i.e.*, 26 spots) on the Network in the period that begins two weeks immediately before the start of the fourth calendar quarter and ends with the end of the fourth calendar quarter. FOX will coordinate with Company with respect to which particular promotional spots should run in each time period designated by FOX for Company's promotional spots.

    b.    In addition, for each Broadcast Season, at Company's election, Company may produce at its cost a half-hour program promoting the Programs for that Broadcast Season ("Launch Program"). FOX will exhibit each Launch Program on the Network in Network's prime time, without cost to Company, during the third calendar quarter preceding the applicable Broadcast Season, at a date and time to be selected by FOX in its sole discretion. Each Launch Program shall be produced and delivered by Company pursuant to FOX's then-current delivery requirements for half-hour prime time programs, which delivery requirements include, among other things, local advertising units.



   c.    During July and August 2002, FOX will use Fox Kids promotional
         time to promote Company's Program line-up for the 2002-2003
         Broadcast Season at comparable levels to the July and August 2001
         promotions on the Fox Kids Network for the 2001-2002 Fox Kids
         Saturday morning line-up.

7.    <u>FOX Services</u>

      FOX, at its cost will provide to Company all technical services necessary to
uplink and transmit to the Stations all content in the Block that meets FOX's
delivery requirements and other requirements, as set forth herein, and is timely
delivered by Company to Network. In addition, FOX will provide to Company
pertinent Nielsen data to the extent permissible under FOX's agreement with
Nielsen. If FOX is prohibited from sharing such data with Company and Company
is required to pay Nielsen for the pertinent data relating to the Block, then FOX
and Company shall negotiate in good faith with respect to the amount that FOX
shall reimburse to Company for each Broadcast Season during the Programming
Term and Programming Term Extension for Company's actual, direct, out of
pocket costs for the Nielsen data relating to the Block.

8.    <u>Program Approvals</u>

      a.    <u>Approvals and Consultation</u>. The name(s) of the Block and all marks
      to be used in connection therewith are subject to FOX's approval, which
      shall not be unreasonably withheld and will be made in a timely fashion, it
      being understood that, without limitation to any of FOX's rights in this Term
      Sheet, FOX will not approve any name and/or mark that includes the name
      and/or mark of any other programming service. Without limitation to the
      foregoing, FOX shall have the right to include a presentation credit within
      the name of the Block (<i>e.g.</i>, "FOX Presents...") in such size, style of type,
      color, placement and form as FOX elects from time to time, in its sole
      discretion.

      b.    Company shall meaningfully consult with FOX as to the Children's
      Programs and any entertainment television programs intended for a teenage
      audience (<i>e.g.</i>, ABC's After-School Specials) that are intended to be
      included in the Block. FOX shall have the right to approve or disapprove, in
      a timely manner, all types of programs not listed in the preceding sentence,

for inclusion in the Block. FOX shall have the right to approve, in a timely manner, all Programs in the Block with respect to FOX's then-current standards and practices, time segment, format and other delivery requirements, clearance policies relating to promotion and advertising and to FOX's other operating policies (as FOX may change any of the foregoing from time to time) ("FOX's Approval Rights"). If FOX disapproves of any Program with respect to any of the above-listed matters, then Company will continue to submit substitutes until such time as FOX has approved Programs sufficient to fill the entire Block. Subject to FOX's right of consultation, FOX's Approval Rights, and to paragraph 4 above, Company shall have the exclusive right to program the Block (including without limitation, Program content and scheduling, and the selection and scheduling of promotional announcements, national commercial units and sweepstakes and promotions), and to produce a Launch Program for each Broadcast Season. If Company requests an adjustment in the arrangement of the segments in FOX's time segment and/or format requirements, FOX will give good faith consideration to such request.

c.      Without limitation to the foregoing, Company may not include in the Block advertisements for: (a) any other video delivery system or distributor (including, without limitation, any broadcast, cable or satellite exhibition service or other multi-channel or single-channel video programming exhibitor or distributor) (each a "Television Service"); or (b) any program or other material that is exhibited on any Television Service. Notwithstanding anything to the contrary in the foregoing, during and after the 2004-2005 Broadcast Season, Company may use up to 30 seconds of national commercial units per week in the Block to advertise specific programs that are being exhibited on a cable or satellite Television Service on a five-consecutive-days-per-week basis and that have been (and may still continue to be) exhibited in the Block; provided that such advertising may not include the day, date or time of such programs; and provided, further that such cable or satellite Television Service promotes the Block and/or Programs in the Block on a *quid-pro-quo* basis. For purposes of this Term Sheet, a Television Service does <u>not</u> include distribution for home viewing by means of NTSC ½ inch VHS and ½ inch Beta products or by means of DVDs.

d.      <u>Legal Compliance and Exhibition Rights</u>. Company shall ensure that all content included in the Block and the Launch Programs and all activities

related thereto (including without limitation, the Programs, promotional and advertising content, promotions and sweepstakes) are in compliance with the 1990 Children's Television Act, as amended ("CTA"), the Children's On-line Privacy Protection Act ("COPPA") and all the applicable laws and governmental rules and regulations. Further, Company shall ensure that FOX shall have all rights necessary to telecast, transmit and exhibit in the United States, its territories and possessions, including Puerto Rico, all Programs and all other content Company provides for inclusion in the Block (including without limitation, national advertisements and promotional content). In addition, Company grants FOX the right to distribute the Block for exhibition on all television stations, and other television exhibition affiliates, licensed to do so by FOX (each a "Station" and collectively "Stations") and on the Fox Net cable service. In accordance with FOX's customary practice, FOX will have the right to permit the Stations and Fox Net to shift the broadcast times of the Block (including without limitation to accommodate pre-emptions and make goods).

9.    Educational Programming

a.    Company will include in the Block at least one-half hour of programming that qualifies as educational programming pursuant to the CTA (a "Core Program") per week throughout each Broadcast Season.

b.    To the extent that Company has or obtains the necessary rights, Company will provide each Station the opportunity to license from a broad selection at least two-and-a-half hours per week of additional Core Programs (each an "Additional Core Program") that are each a half-hour in length. Such Additional Core Programs shall be licensed to the Stations on a "no-cash/barter basis" and shall provide each Station with at least the amount of local commercial units customary in the television syndication industry for this type of programming. Company shall also ensure that the Stations shall have the right to exhibit such Additional Core Programs during the applicable Broadcast Season in any time period outside of the Block that Station elects.

c.    The Core Program and Additional Core Programs shall be of first-class quality, with production values consistent with other programs exhibited on the Network and by other major U.S. television broadcast

networks.10.     Merchandising Participation

If Company's share of the gross revenues it derives from the exploitation of U.S. merchandising rights to the Programs ("Company's Royalties") with respect to each consecutive 12-month period commencing October 1, 2002 and ending on September 30 of the last year of the Programming Term (and the Programming Extension Term, if applicable) exceeds $25 million, Company shall pay FOX an amount equal to 5% of 100% of Company's Royalties in excess of $25 million. Company will pay to FOX the FOX share of Company's Royalties, if any, within 60 days after the close of each calendar quarter.

11.     First Negotiation for Additional Broadcast Rights and Ancillary Rights

To the extent that an entity affiliated with NewsCorp Limited (each an "Entity") is in the business of licensing, exercising or otherwise exploiting any or all ancillary rights to television programs (*e.g.*, home video, publishing, interactive, international television, internet and theatrical rights), and to the extent that Company owns or controls such ancillary rights and seeks to offer any of such ancillary rights to parties that are unaffiliated with Company, and subject to Company's pre-existing commitments, Company shall so notify FOX in writing. FOX shall then have a period of five (5) business days to advise Company whether FOX or an Entity is interested in entering into negotiations with Company to acquire such ancillary rights offered by Company. FOX shall have the right to designate which Entity shall have the right of first negotiation and first refusal with respect to each ancillary right. If FOX or the designated Entity notifies Company that neither FOX nor such designated Entity is interested in negotiating for such ancillary rights offered by Company or if FOX or such designated Entity fails to notify Company within said five (5) business-day period of FOX's/designated Entity's interest in entering into negotiations with Company to acquire such ancillary rights offered by Company, FOX's right of first negotiation shall lapse and Company shall be free to license such ancillary rights to a third party other than FOX or the designated Entity. If FOX or the designated Entity responds within such five (5) business-day period that FOX or the designated Entity is interested in negotiating to acquire such ancillary rights, Company and FOX or such designated Entity shall negotiate exclusively for a period of ten (10) business days the terms by which FOX or such designated Entity shall



acquire such ancillary rights offered by Company. If the parties fail to reach an agreement during such ten (10) business-day period, Company shall be free to negotiate with third parties other than FOX or the designated Entity with respect to the terms and conditions of the acquisition of such ancillary rights offered by Company; provided, however, that Company may not enter into an agreement with any third party on terms less favorable to Company than the last offer proposed to FOX or the designated Entity by Company for the acquisition of such ancillary rights.

12.    Corporate Guarantee

Company shall provide to FOX evidence of its ability to meet its financial commitments throughout the Programming Term and Programming Extension Term, if it becomes applicable. Such evidence shall be in the form satisfactory to FOX. FOX hereby approves as satisfactory evidence of Company's financial ability its filings with the SEC for so long as Company remains a publicly traded company on the New York Stock Exchange or other major U.S. stock exchange.

In addition, throughout the Programming Term and the Programming Extension Term, if applicable, Company shall provide FOX with an irrevocable letter of credit, satisfactory to FOX in its sole discretion, that at all times provides for credit in an amount equal to $25 million. FOX shall bear the cost for maintaining such letter of credit.

If at any time Company fails to pay the Time Buy Fee, or any portion thereof, to FOX on the date such payment is due, FOX may thereafter draw on the letter of credit to recover any and all amounts then due and owing, and, if FOX draws on such letter of credit, Company shall immediately make arrangements with the financial institution providing the letter of credit to increase the amount of the letter of credit to the $25 million. Any failure by Company to maintain the face amount of the letter of credit at $25 million as set forth herein, shall constitute a material breach.

Notwithstanding anything herein to the contrary, if Company has declined to exercise its option to extend the Programming Term, Company shall have the right to make any cash payments due FOX for the last Broadcast Season by permitting FOX to draw down on the letter of credit for the amount of the cash payment designated by Company. In such event, Company shall not be required to increase

the amount of the letter of credit to $25 million during such last Broadcast Season.

13.  Confidentiality

Company and FOX shall keep, and shall each ensure that its respective officers, directors, agents, employees and any third party to whom it discloses any terms of this Term Sheet, the Bid Terms sent to Company by FOX and any other terms included in Company's bid (collectively "Bid") as permitted by this paragraph shall keep secret and confidential the terms of the Bid. Neither Company nor FOX shall, without the prior written consent of the other, disclose the terms of the Bid to any third party (other than to its outside legal and financial representatives). Notwithstanding anything herein to the contrary, the parties acknowledge that both Company and FOX are public companies that are obliged under the securities laws to make public disclosure, from time to time, of material information and that such material information may include certain information contained in this Term Sheet. In the event that either party, in the judgment of its outside SEC counsel, is required to disclose any information contained in this Term Sheet, the disclosing party shall promptly notify the other party in writing. The disclosing party shall provide the other party with the proposed text of any proposed written disclosure regarding information contained in this Term Sheet for comment by the other party. The disclosing party shall make any reasonable changes that the other party may require in any written disclosure of information contained in this Term Sheet, it being understood, however, that the final text of any such disclosure shall be determined by the disclosing party's outside SEC counsel based on the disclosure requirements of the securities laws. FOX and Company shall mutually approve a press release to announce this agreement.

14.  Formal Agreement

The parties shall enter into a formal agreement, but until such time as such formal agreement is executed this Term Sheet and the provisions customarily included in FOX's agreements of this type (including without limitation, insurance, indemnification, audit rights, representations and warranties, etc.) shall constitute the agreement between the parties.

Agreed and accepted this 18th day of January 2002.

4KIDS ENTERTAINMENT, INC.                    FOX BROADCASTING COMPANY

By: _____                 By: _____

Its: _____                Its: _____
                                                  Network Business Operations

**EXHIBIT B**

March 2, 2006

Mr. Ed Wilson
Fox Broadcasting Company
10201 West Pico Blvd
Los Angeles, CA 90053

Re: Fox-4Kids Term Sheet Amendment

Dear Ed:

Reference is made to the Fox Broadcasting Company ("FOX") and 4Kids Entertainment, Inc. ("Company") Saturday Morning Programming Block Time License Minimum Terms dated as of January 18, 2002 ("Term Sheet") as amended on December 9, 2005 and January 31, 2006.

FOX and Company hereby agree to amend the Term Sheet as follows:

1. Paragraph 2 of the Term Sheet is hereby deleted in its entirety and is replaced by the following:

"a. Company hereby agrees to extend the Programming Term until September 8, 2008. In consideration of the extension of the Programming Term, Company shall pay FOX a "Time Buy Fee" of $20 million in cash for the 2006-2007 Broadcast Season and $20 million in cash for the 2007-2008 Broadcast Season. The "Time Buy Fee" shall be payable in accordance with the following payment schedule:

| DUE DATE | PAYMENT |
|---|---|
| October 1, 2006 | $5,000,000 |
| January 5, 2007 | $5,000,000 |
| April 1, 2007 | $5,000,000 |
| July 1, 2007 | $5,000,000 |
| October 1, 2007 | $5,000,000 |
| January 5, 2008 | $5,000,000 |
| April 1, 2008 | $5,000,000 |
| July 1, 2008 | $5,000,000 |

b. FOX shall have the option but not the obligation to lease the Block for the 2008-2009 Broadcast Season. If FOX elects to lease the Block for the 2008-2009 Broadcast Season, FOX shall be required to lease the Block to Company in accordance with the provisions of this Paragraph 2.b.

FOX shall notify Company in writing by no later than August 31, 2007 regarding whether FOX intends to lease the Block for the 2008-2009 Broadcast Season. If FOX notifies Company that FOX will be leasing the Block, Company shall be obliged to lease the Block from FOX for the 2008-2009 Broadcast Season in accordance with the terms and conditions of the Term Sheet (as amended by this letter amendment) except that



Company shall pay FOX a "Time Buy Fee" of $20 million which shall be payable in accordance with the following payment schedule:

| DUE DATE | PAYMENT |
|---|---|
| October 1, 2008 | $5,000,000 |
| January 5, 2009 | $5,000,000 |
| April 1, 2009 | $5,000,000 |
| July 1, 2009 | $5,000,000 |

The Programming Term shall be extended until September 7, 2009.

c. If FOX elects in its sole discretion to lease the Block for the 2009-2010 Broadcast Season, FOX will so notify Company by no later than November 1, 2008. Commencing on November 15, 2008 and ending on December 15, 2008 ("Negotiation Term"), Company will have the exclusive right to negotiate with FOX the terms and conditions under which the Programming Term may be extended. If Company and FOX do not reach agreement on or prior to December 15, 2008, then, until March 30, 2009, FOX shall not enter into an agreement with a third party for the rights offered to Company on terms that are more favorable to such third party than the terms of the last offer made by FOX to Company during the Negotiation Term without first offering such terms to Company. Such negotiation rights and first refusal rights shall be in accordance with FOX's standard terms.

2. Paragraph 3 of the Term Sheet is hereby amended by adding the following new provision Paragraph 3.g.:

"g. Company acknowledges that in markets where Fox Television Stations ("FTS") owns and operates two stations ("Duopoly Markets"), FOX shall have the right to move the Block to the non-Fox network station owned by FTS ("NFN Station") subject to the following conditions:

(i) FOX shall, in each instance, consult with Company on the timing of any move to an NFN Station, and shall provide at least 90 days notice to Company to allow for minimal viewer disruption. Unless otherwise agreed to in writing by Company, FOX shall not move the Block to an NFN Station during the "hard eight" advertising period between October 1st and December 20th.

(ii) Fox agrees to use reasonable commercial efforts and work in consultation with Company to maximize viewer awareness of the station change to the NFN Station.

(iii) If the day and time period that the Block is scheduled to be telecast on the NFN Station is different from the day and time period that the Block is telecast on the Fox network station, FOX and Company shall mutually agree on the day and time period that the Block will be telecast on the NFN Station.

(iv) If FTS sells any NFN Station to which the Block has been moved or FTS is no longer controlling the day or time period in which the Block is airing on such NFN Station such that the Block is no longer telecast, FOX shall be required, at no expense



to Company, to provide Company with a comparable clearance for the Block in such Duopoly Market.

(v) FOX shall notify Nielsen that the FOX network has shifted affiliations for those time periods in each of those Duopoly Markets where the Block has been moved to an NFN Station so that Nielsen includes such NFN Station in the computation of the weekly network ratings (i.e, non-syndication) for the Block on the FOX network.

Notwithstanding anything herein to the contrary, if any transfer of the Block from a FOX network station to an NFN Station results in the Block not qualifying for the weekly Nielsen ratings of the FOX network or the Block not receiving a rating for one or more NFN Stations, FOX shall not have the right to move the Block to such NFN Station without obtaining Company's prior written approval.

3. Paragraph 4 of the Term Sheet is hereby amended by adding the following new provision Paragraph 4.d.

"d. In the event that Company intends to program any teen programming in the Block during the Programming Term, then Company shall notify FOX thereof in writing not later than 60 days ("New Programming Notice") prior to programming such teen programming. FOX and Company agree to negotiate in good faith for such period of time, not to exceed 30 days from the time of FOX's receipt of a New Programming Notice, regarding the terms pursuant to which such teen programming may be programmed (which terms will include among other things that, notwithstanding anything to the contrary, and without limitation to any other terms, herein, the commercial split for such teen programming shall be as follows:  FOX will retain two minutes per broadcast half-hour and Company will retain seven minutes per broadcast half-hour as well as the balance of the promotional time and programming time for such broadcast half-hour in the Block.  It is understood and agreed that Company will not program any teen programming in the Block except as agreed to in writing by Company and FOX.

4. Paragraph 5.a. of the Term Sheet is hereby deleted in its entirety and is replaced by the following:

"a. As consideration for all rights granted to Company hereunder, Company shall pay to FOX a "Time Buy Fee," in cash of $25,312,500 for each of the 2002-2003 Broadcast Season, the 2003-2004 Broadcast Season, the 2004-2005 Broadcast Season and the 2005-2006 Broadcast Season. The Time Buy Fee shall be paid on the basis of the payment schedule set forth in Paragraph 5.b. below. The Time Buy Fee shall be subject to adjustment as provided in this Term Sheet".

5. Paragraph 5.c. of the Term Sheet is hereby deleted in its entirety.

6. Paragraph 7 of the Term Sheet is hereby amended by adding the following sentence at the end thereof:

"For the avoidance of doubt, during the extension of the Programming Term provided for pursuant to this amendment, FOX will provide the Company, at no cost to the Company, with the following services: Nielsen data, commercial integration, access to the STBS billing system, transmission to the network and such other services that FOX has provided to Company from the 2002 -- 2003 Broadcast Season to date.



7. Paragraph 12 of the Term Sheet is hereby deleted in its entirety.

Except as specifically amended herein, the Term Sheet, and all other terms and conditions therein, remain in full force and effect. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Term Sheet. "

Please confirm that the foregoing satisfactorily sets forth our agreement by signing the enclosed copy of this letter and returning it to me.

Sincerely yours,

4Kids Entertainment, Inc.

By: _Paul R. Meunier_

March 2, 2006

Agreed to and Accepted:

Fox Broadcasting Company

By: _____

March 4, 2006



## CERTIFICATE OF SERVICE

I hereby certify that on the third day of June, 2008, I caused a true and correct copy of the

ANSWER AND COUNTERCLAIM to be served by Electronic Case Filing and by United States

Postal Service, first-class postage prepaid, addressed to:

Fredric W. Yerman
KAYE SCHOLER LLP
425 Park Avenue
New York, NY  10022
(212) 836-8000

*Attorneys for Plaintiff*
*4Kids Entertainment, Inc.*

_____
Jacqueline K. Seidel